**WO**                                                                                         HJ

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Adan Rodriguez Nunez,<br><br>    Petitioner<br><br>vs.<br><br>Maria Esther Montes Ramirez,<br><br>    Respondent. | No. CV 07-01205-PHX-EHC<br><br>**ORDER** |

Pending before the Court is Petitioner's Ex Parte Verified Petition for Return of Children and Request for Expedited Hearing (Dkt. 1), Petitioner's Ex Parte Verified Petition for Warrant in Lieu of Writ of Habeas Corpus (Dkt. 4), and Petitioner's Verified Request for Registration of Foreign Custody Agreement (Dkt. 5). An evidentiary hearing was held on March 14, 2008, at 1:30 p.m. and continued on March 18, 2008, at 9:30 a.m.

**I.     Background**

Petitioner Adan Rodriguez Nunez and Respondent Maria Esther Montes Ramirez are the married parents of the subject minor children. Petitioner and Respondent married on February 3, 1998, in Los Angeles, California. While living together in California, the couple had two children. JRM, the older of the two children was born on March 18, 1999, and the younger, IRM, was born on May 23, 2001. Both children are United States Citizens. In December of 2001, Petitioner and the oldest child traveled to La Huerta, Jalisco, Mexico. The next month, the oldest child returned to California to be with

Respondent while Petitioner remained in Mexico because he had no legal status in the United States and was not allowed to re-enter the border.  In February 2002, Respondent and both children moved themselves and their belonging to Mexico to be with Petitioner.  Respondent testified that she went to stay with Petitioner in Mexico temporarily so that the children, who had been sick, would get well.  Her intention was always to come back to the United States.  While she was residing in Mexico, the children's American birth certificates were recorded in the La Huerta, Jalisco Civil Registry, establishing their Mexican citizenship.  The children were also enrolled in school in La Huerta, the oldest since 2002 and the youngest since 2004.

On April 29, 2005, Respondent moved out of the family's home.  Petitioner testified that Respondent had problems with his niece and that he and Respondent had discussed that she would move into her mother's house.  Petitioner's view is that Respondent left on her own accord.  Respondent testified that Petitioner and his niece had "struck" her and that she was essentially "chased" out of the house.  Petitioner subpoenaed Respondent to appear before a municipal law judge to discuss their problems and attempt to reach an agreement regarding custody of the children.  On May 4, 2005, Petitioner and Respondent, each represented by an attorney, met before La Huerta Municipal Judge Faviola Nogales Guitierez.  No agreement was reached.

While Respondent was living at her mother's house, the children remained at Petitioner's house.  Respondent would come and visit with them.  Petitioner testified that, at first, he allowed Respondent to take the children with her during her visits.  Sometime in July 2005, however, Petitioner stopped allowing Respondent to take the children during visits.  Petitioner testified that Respondent had threatened to take the children to the United States and he was afraid that she might follow through on that threat.  Respondent believed that Petitioner was wrongfully preventing her access to the children.

On July 15, 2005, Petitioner filed for custody and guardianship of the children with the Mixed Court of First Instance of the 29th Judicial District in Cihuatlan, Jalisco.  Respondent testified that she was not served with notice of this action.  On the morning of

- 2 -

December 16, 2005, without notice to Petitioner, Respondent took the children from their schools and brought them to the United States. Petitioner testified that he did not know where Respondent and the children had gone and that he made various attempts to locate them. On May 15, 2006, as a result of his July 15, 2005, filing, the Jalisco court granted temporary guardianship and custody of the children to Petitioner (the "Jalisco custody order")[1] On June 9, 2006, Petitioner filed a Hague Convention application with the Mexican Central Authority. Petitioner filed a Hague Convention Petition in this Court on June 19, 2007.

**II.   Analysis**

Congress enacted the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. ("ICARA") to implement the Convention on Civil Aspects of International Child Abduction done at the Hague on October 25, 1980 (the "Convention"). Both the United States and Mexico are signatories to the treaty, and thus, are Contracting States within the meaning of the treaty. In enacting the federal legislation implementing the Convention, Congress recognized that "[p]ersons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention[,]" and that "[i]nternational abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international treaty can effectively combat this problem." 42 U.S.C. § 11601(a)(2)-(3). The express objectives of the Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and to ensure that rights of custody and of access under the law of one

---

[1]The Custody Order provides in relevant part:

[A]t this time temporary custody is declared in favor of the father, Adan Rodriguez Nunez without implying any restrictions to the coexistence between the mother and the minor children so that they will not lose the bonds that should exists between children and parents so long as such does not involve harm, danger, or attempts to remove said children from their identified home and under no circumstances are they to leave the related City much less the State or Country while a final resolution is pending.

Contracting State are effectively respected in the other Contracting States." Convention, Art. 1, (reprinted at 51 FR 10494); <u>see</u> also <u>Koch v. Koch</u>, 450 F.3d 703, 711 (7th Cir. 2006) ("An action under the Convention and ICARA is not an action to determine the merits of custody rights...." "The court's task is to simply determine which country is the proper forum for that custody determination.").

Thus, pursuant to Article 12 of the Convention, the Court is required to order the return of the subject minor children if they were wrongfully removed from Mexico or retained in the United States. A child is wrongfully removed or retained under the meaning of the Convention where:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, Art. 3.

**A.     Wrongful Removal or Retention from State of Habitual Residence**

The evidence in the record establishes that Mexico was the children's habitual residence at the time Respondent removed them to the United States. Habitual residence is the place where the children were living before the wrongful removal and retention. <u>Kiljowska v. Haines</u>, 431 F. Supp. 2d 873, 878 (N.D. Ill. 2006) (the court looks back in time, not forward). "To determine habitual residence, the court must focus on the child, not the parents, and examine past experiences, not future intentions." <u>Kiljowska</u>, 431 F. Supp. 2d at 878. Habitual residence is essentially "the child's ordinary residence at the time of the allegedly improper removal." <u>Kiljowska</u>, 431 F. Supp. 2d at 879 (citing <u>Miller v. Miller</u>, 240 F.3d 392, 400 (4th Cir. 2001).

Prior to Respondent bringing the children to the United States on December 16, 2005, the children had been living in Mexico for more than 3 years, a time period constituting the majority of each child's life at the time. The children were registered as citizens in Mexico and were attending school in Mexico. Respondent contends that the

- 4 -

1  United States is the country of the children's habitual residence but provides no
2  persuasive legal authority or facts supporting that view. The evidence presented
3  demonstrates that Petitioner and Respondent had a difficult marital situation. There is
4  evidence that Petitioner prevented Respondent from having access to her children while
5  still in Mexico. Nevertheless, these facts do not bear upon the issue of habitual residence.
6  If Respondent believed that she and the children had been wrongfully retained in Mexico
7  for three years from February 2002 until December 2005, her remedy would have been to
8  seek return in the Mexican Courts of the children to the United States under the
9  protections of the Hague Convention, not to unilaterally remove the children to the United
10 States.

11 The Ninth Circuit has held that "[t]he Convention is designed to prevent child
12 abduction by reducing the incentive of the would-be abductor to seek unilateral custody
13 over the children in another country. The greater the ease with which habitual residence
14 may be shifted without the consent of both parents, the greater the incentive to try."
15 Mozes v. Mozes, 239 F.3d 1067, 1079 (9th Cir. 2001). The Sixth Circuit's opinion in
16 Friedrich v. Friedrich is particularly instructive on this point:

> Every family dispute has its own unique set of facts, and the case before us certainly is no different. However, there is a central core of matters at which the Hague Convention was aimed: situations where one parent attempts to settle a difficult family situation, and obtain an advantage in any possible future custody struggle, by returning to the parent's native country, or country of preferred residence. That is exactly what happened here. The rights and wrongs of the actions of the respective parents are not before us for disposition on the merits. But it is clear, as shown both by actions at the time and by the subsequent strenuous course of this litigation, that both parents maintained a lively interest in their relationship with their child, Thomas.
>
> Under such circumstances, the Hague Convention is clearly designed to insure that the custody struggle must be carried out, in the first instance, under the laws of the country of habitual residence, which is Germany in this case.
>
> The affirmative defenses of Section 11603(e)(2) of the Act offer an opportunity, in extraordinary cases, for a court in the country of flight to consider the practical realities of the situation. However, it is the clear import of the Convention that in most cases the duty of that court, when the niceties of the convention are met, is to return the child to the country of habitual residence for resolution of the custody dispute under the laws of that country.

- 5 -

1 Friedrich v. Friedrich, 983 F.2d 1396, 1403 (6th Cir. 1993).  Moreover, much of
2 Respondent's evidence relating the relative parenting skills of her versus Petitioner are
3 irrelevant in deciding a Hague Convention petition.  See e.g., Adams ex rel. Naik v. Naik,
4 363 F. Supp. 2d 1025, 1027 (D. Ill. 2005) ("The parties provide extremely divergent
5 factual statements regarding the relative fitness of each to parent Kai. They are not
6 relevant here, and I make no findings as to custody or parental fitness of the parties.  My
7 jurisdiction in cases brought under the Convention does not extend to the determination
8 of custody rights.").  These are considerations for the family court that will eventually
9 determine custody in this matter.

10 The facts in the record demonstrate that Mexico was the children's regular,
11 ordinary and established home at the time they were removed to the United States.
12 Further, at the time of the children's removal to the United States, both Petitioner and
13 Respondent had natural parental rights to custody of the children, and no court had
14 awarded either with sole custody.  Even though it appears that Petitioner was preventing
15 Respondent from exercising her joint right to custody of the children, that is not an issue
16 for this Court.  The children were living with Petitioner and, as their father, he also had
17 some rights to custody.  Thus, Petitioner has established the second element of his case.[2]

18 **B.   Exceptions**

19 The Court is not bound to order the children's return if Respondent can
20 demonstrate one of several defenses or exceptions.  The first two defenses require a
21 showing by a preponderance of the evidence that (1) judicial proceedings were not
22 commenced within one year of the children's removal and they are well-settled in their
23 new environment; or (2) the children object to being returned and have obtained the age

---

26 [2]The Court previously noted that this element had been established.  (See Dkt. 37,
27 Order on Petitioner's Motion for Summary Judgment ("Respondent does not dispute that Petitioner was exercising his custody rights.  Thus, further development of this issue is
28 unnecessary for a ruling in Petitioner's favor.")).

- 6 -

1 and degree of maturity at which it is appropriate to take account of their views.[3] The third
2 defense that is potentially applicable here requires a showing by clear and convincing
3 evidence that there is a grave risk that the children's return would expose them to
4 physical or psychological harm or otherwise place them in an intolerable situation. Even
5 if an affirmative defense or exception applies, the Court still has discretion to order return
6 of the children if it would "further the aims of the Hague Convention." Giampolo v.
7 Erneta, 390 F. Supp. 2d 1269, 1280 (N.D. Ga. 2004).

### 1. The Grave-risk Exception

9 A court may deny return of a child to the habitual residence if "there is a grave risk
10 that his or her return would expose the child to physical or psychological harm or
11 otherwise place the child in an intolerable situation." 42 U.S.C. § 11603(e)(2)(A). This
12 defense must be proven by clear and convincing evidence. Under the Convention, "grave
13 risk of harm" exists in two situations: (1) when return of the child puts the child in
14 imminent danger <u>prior</u> to resolution of the custody dispute (e.g., returning child to a zone
15 of war, famine, or disease); or (2) where there is serious abuse or neglect, or extraordinary
16 emotional dependence, when the court in the country of habitual residence, for whatever
17 reason, may be incapable or unwilling to give the child adequate protection. Friedrich v.
18 Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) (emphasis added). Proof of grave risk of
19 harm requires "specific evidence of potential harm" to children. Rydder v. Rydder, 49
20 F.3d 369 (8th Cir. 1995).

---

[3] Detailed discussion of this exception is not necessary. At the March 14, 2008, hearing, the Court refused to hear the testimony of the oldest child, aged 8. Numerous cases have held that children of such a young age are too young to testify in these types of proceedings. See Giampolo, 390 F. Supp. 2d at 1285 (10-year-old child interviewed <u>in camera</u> and the Court determined that the child appeared to have "internalized Respondent's views about the possibility of being returned" and had been "influenced by Respondent's preference for her to remain here."); Hazbun Escaf v. Rodriguez, 200 F. Supp. 2d 603, 615 (E.D. Va. 2001) (return ordered despite objection of 13-year-old); Garcia, 2006 U.S. Dist. LEXIS 64828 at *38-39 (11-year-old, though well mannered and articulate, was not of sufficient age and maturity); Than v. Duquette, 613 A.2d 486 (1992) (noting that defense does not apply to 9-year-olds).

- 7 -

1   Respondent has presented some evidence that she and Petitioner engaged in heated
2   arguments, including occasions when she alleges that Petitioner struck her physically.[4]
3   These acts are not relevant to the issue of whether the children would be placed in an
4   intolerable situation or in grave risk of harm if returned to Mexico. See Nunez-Escudero
5   v. Tice-Menley, 58 F.3d 374, 375-78 (8th Cir. 1995) (denying defense where
6   respondent's allegations that she was physically, sexually, and verbally abused by her
7   husband and treated as a prisoner by her husband and father in law concerned problems
8   she had between her and her husband and father in law, and did not concern any potential
9   risk to the baby); see also Tabacchi v. Harrison, 2000 WL 190576 (N.D. Ill) (although
10  petitioner's behavior toward his wife was unacceptable, to qualify as a grave risk of harm
11  under the Convention, the risk must be to the *child*).

12  Respondent also testified that Petitioner has struck the children on different
13  occasions, including striking them with a belt. This evidence is contested. Even if true,
14  however, this evidence is not clear and convincing proof that return of the children to
15  Mexico would cause them a "grave risk" of harm that the Mexican courts are not ready
16  and able to protect the children from. See Friedrich, 78 F.3d at 1068 ("In thinking about
17  these problems, we acknowledge that courts in the abducted-from country are as ready
18  and able as we are to protect children. If return to a country, or to the custody of a parent
19  in that country, is dangerous, we can expect that country's courts to respond
20  accordingly.") (contrasting Nunez Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir.
21  1995) (if parent in Mexico is abusive, infant returned to Mexico for custody
22  determination can be institutionalized during pendency of custody proceedings)).  Thus,

---

[4] Respondent contends that one of the physical incidents occurred in front of JRM and Respondent's oldest child from a previous marriage. This incident occurred in May 2003, when the couple was still living together.

- 8 -

Respondent has not met her burden of proof, and the "grave risk" exception is therefore inapplicable.[5]

### 2. The Well-Settled Exception

Under the Convention, the Court is not required to order return of the children to the country of their habitual residence prior to their wrongful removal if it shown by a preponderance of the evidence that judicial proceedings were not commenced within one year of the children's removal and they are now well-settled in their new environment. See Convention, Art. 12; 42 U.S.C. § 11603(e)(2)(B). Respondent brought the children to the United States on December 16, 2005. Petitioner filed a Hague Application with the Mexican Central Authority on June 9, 2006, and the application was later transferred to the National Center for Missing and Exploited Children on or about July 14, 2006. The current matter was not filed until June 19, 2007, eighteen months after the removal.

Petitioner urges the Court to find that the one-year period has been equitably tolled. Petitioner relies on Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998), a case in

---

[5] The Court has also considered whether or not removal of the children from the care of their mother would cause them psychological harm justifying this exception. Respondent relies on the case of Steffen F. v. Severina P., 966 F. Supp. 922 (D. Arizona 1997) (Roll, J.). In that case, the Court was persuaded by the "compelling testimony" of a Doctor that the child faced "a grave risk of psychological harm if he [was] returned to Germany." The Doctor's testimony established that removal of the child from "his mother for any period of time longer than a few weeks would likely result in unbonding and unattachment" and that "a grave risk exists because a child being unbonded and unattached often produces long-term, serious psychological problems." The District Court adopted the reasoning of the Eighth Circuit in Rydder v. Rydder, 49 F.3d 369, 373 (8th Cir. 1995), which recognized that separating a child from his or her primary caretaker creates a risk of psychological harm. Nonetheless, the Eight Circuit refused to find a grave risk of harm in Rydder, emphasizing that the mother had failed to present "specific evidence of potential harm to the children at issue."

Here, while the Court can surmise that psychological harm might result from separation from the mother, Respondent has not presented specific evidence of potential harm to these children. Moreover, the Court's review of the authorities has not revealed a case in which a Court, *sua sponte*, has ordered a psychological examination of the children. Reports from Ebony House refer to psychological diagnoses and treatments, but the individual making the reports was not called as a witness.

- 9 -

1  which the Eleventh Circuit recognized that the one-year period in Article 12, may be
2  equitably tolled. It appears that the Eleventh Circuit is the only Court of Appeals to have
3  concluded that equitable tolling applies to the one-year period in Article 12. Other
4  district courts have come to conflicting conclusions, although a majority appear to agree
5  that equitable tolling applies. See, e.g., Belay v. Getachew, 272 F. Supp. 2d 553, 563 (D.
6  Md.
7  2003) (holding that equitable tolling applies); Mendez Lynch v. Mendez Lynch, 220 F.
8  Supp. 2d 1347, 1362-63 (M.D. Fla. 2002) (same); with Anderson v. Acree, 250 F. Supp.
9  2d 872, 875 (S.D. Ohio 2002) (expressing doubts that equitable tolling applies); Matovski
10 v. Matovski, 2007 U.S. Dist. LEXIS 65519 (S.D.N.Y. 2007) (equitable tolling does not
11 apply); Jimenez v. Lozano, 2007 U.S. Dist. LEXIS 10175 (D. Wash. 2007) (equitable
12 tolling applies).

13 The Southern District of New York's discussion of the issue in Matovski provides
14 some insight into the reasons various district courts have refused to equitably toll the one-
15 year period in Article 12. First and foremost, these district courts have recognized that
16 the one-year period is not a "limitations period" that should be subject to tolling. The
17 Matovski Court noted:

> A petition for the return of a child *is not barred if it is filed over one year from the date of removal.* Rather, the drafters of the Hague Convention decided that after the passage of a year, it became a reasonable possibility that the child could be harmed by its removal from an environment into which the child had become settled, and that the court ought to be allowed to consider this factor in making the decision whether to order the child's return.

22 Matovski, 2007 U.S. Dist. LEXIS 65519 at *32 (emphasis in original) (quoting Anderson,
23 250 F. Supp. 2d at 875.). The Convention's framers also recognized that "although its
24 aim is to ensure the return of abducted children without reaching the merits of underlying
25 custody disputes, there could come a point at which a child would become so settled in a
26 new environment that repatriation might not be in its best interest. In other words, if
27 more than one year has passed, a 'demonstration that the child is now settled in its new
28 environment' may be a sufficient ground for refusing to order repatriation." Blondin v.

- 10 -

Dubois, 238 F.3d 153, 164 (2d Cir. 2001) (citing Explanatory Report at p. 107). Although this analysis arguably requires the Court to reach the underlying custody dispute, a matter generally outside the scope of the Convention, the framers "settled on the one-year time limit, which, 'although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard.'" Blondin, 238 F.3d at 164 (citing Explanatory Report at p. 107). While at least one other district court in the Ninth Circuit has tolled the one-year period as suggested by Petitioner, the Ninth Circuit Court of Appeals has not ruled on this issue.[6] The Court finds the reasoning of the Second Circuit and the Southern District of New York compelling. Thus, the Court will not equitably toll the one-year period as suggested by Petitioner.

Even if the Court were to accept the possibility of equitably tolling the one-year period, it is unclear exactly why Petitioner waited eighteen months to file his application in this Court. Petitioner contends that the delay was caused by his inability and the inability of the respective agencies to locate Respondent and the children. There is, however, credible evidence that Petitioner knew or could have discovered Respondent's whereabout within one year. Respondent contends that Petitioner knew she had family in the Phoenix area and could have contacted them. What is clear is that when Petitioner eventually did file his application before this Court, eighteen months after Respondent brought the children to the United States, the children were already well-settled in Arizona. The record demonstrates that the children are attending school here, bonding with their older brother and Respondent's family, attending counseling, and otherwise adjusting to their new lives. Because Petitioner waited over one year to file his action in

---

[6] The Court is not bound the by the decision in Jimenez v. Lozano. 2007 U.S. Dist. LEXIS 10175 (D. Wash. 2007) ("Although Mr. Jimenez filed his Hague Convention petition November 10, 2005, more than a year after Mrs. Lozano wrongfully removed RLJ from Mexico, equitable tolling applies in this case, as Mr. Jimenez did not definitely learn of RLJ's location until November 11, 2004 when an agency working for the Central Authority confirmed RLJ and Mrs. Lozano's location.").

1 this Court and because the children are now well-settled in Arizona, the Court will deny
2 their return to Mexico under Article 12.

## III.   Petitioner's State Law Claim

Petitioner has also brought an Arizona state law claim pursuant to Arizona's Uniform Child Custody Jurisdiction and Enforcement Act, A.R.S. § 25-1001 et seq. ("UCCJEA"). Pursuant to A.R.S. § 25-1005(B), "a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of this chapter must be recognized and enforced under Article 3 of this chapter." The UCCJEA states that a "court of this state shall treat a foreign country as if it were a state of the United States...." A.R.S. § 25-1005(A). To determine whether the "factual circumstances" of the Jalisco custody order are in substantial conformity with the jurisdictional standards of the UCCJEA, it is necessary to look to the jurisdictional chapter in Article 2. That chapter provides that "a court of this state has jurisdiction to make an initial child custody determination only if any of the following is true...[t]his state is the home state of the child on the date of the commencement of the proceeding...." A.R.S. § 25-1031. The jurisdictional chapter also has detailed provisions regarding notice and opportunity to be heard. See A.R.S. § 25-1035(A)-(B). Specifically, Article 2 does not govern the enforceability of a child custody determination made without notice or an opportunity to be heard." A.R.S. § 25-1035(B).

The Order issued by the Jalisco court on May 15, 2006, references a summons issued to Respondent on August 5, 2005, to appear before the court within 8 days to present her case or face entry of default, the Court deeming her failure to respond as an admission to Petitioner's charges. Respondent testified that she never received notice of the Jalisco action, nor did she participate in any of the hearings. Petitioner has not filed any evidence proving that Respondent was served. When properly served with a subpoena to appear before the Municipal Law Judge on May 4, 2005, she did appear and was represented by an attorney. The Court does not believe that Respondent, whose actions have consistently demonstrated a desire for custody over the children, would

- 12 -

1 ignore a summons to appear at a custody hearing. Thus, it is the finding of this Court that
2 the Jalisco custody order was not issued in substantial conformity with the jurisdictional
3 requirements of Article 2 of Arizona's UCCJEA.[7]

### IV. Conclusion

The Court finds that although Petitioner has arguably met his burden under the Hague Convention, return of the children to Mexico would be improper under Article 12, because judicial proceedings were not commenced within one-year of the children's removal and they are now well-settled in Arizona. In addition, Petitioner's UCCJEA claim is denied because the Jalisco custody order was not entered in substantial conformity with the jurisdictional requirements of Arizona's UCCJEA.

Accordingly,

**IT IS ORDERED** denying Petitioner's Ex Parte Verified Petition for Return of Children and Request for Expedited Hearing (Dkt. 1).

**IT IS FURTHER ORDERED** denying Petitioner's Verified Request for Registration of Foreign Custody [Order] (Dkt. 5).

**IT IS FURTHER ORDERED** denying Petitioner's Ex Parte Verified Petition for Warrant in Lieu of Writ of Habeas Corpus (Dkt. 4).

//
//
//
//

---

[7] The Court also notes the inherent contradiction between Petitioner's Federal claim and his UCCJEA claim. On the one hand, Petitioner is contending that the Mexican courts have jurisdiction over the underlying custody dispute and that this Court must order their return to Mexico for continued custody proceedings there pursuant to the Hague Convention. On the other hand, Petitioner's UCCJEA claim requires this Court (a court in Arizona) to reach the merits of the underlying child custody determination by registering and enforcing the Jalisco custody order pursuant to Arizona's UCCJEA.

- 13 -

DATED this 28th day of March, 2008.

*[signature: Earl H. Carroll]*

Earl H. Carroll
United States District Judge